**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

      **Plaintiff,**

          v.

FERNANDO FIGUEROA-RIVERA,

      **Defendant.**

**CRIM. NO. 17-569 (RAM)**

## OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge.

Pending before the Court is Defendant Fernando Figueroa-Rivera's November 11, 2018 *Amended Motion to Suppress* (Docket No. 49) and the Government's opposition thereto (Docket No. 53). Having reviewed the parties' arguments **and** the documents submitted during the briefing of the original *Motion to Suppress* (Docket No. 16), the Court hereby **DENIES** the *Amended Motion to Suppress*. The February 21, 2020 suppression hearing is converted into a status conference.

### I. BACKGROUND

On November 8, 2017, a Grand Jury returned a two-count Indictment against Defendant Fernando Figueroa-Rivera ("Defendant" or "Figueroa-Rivera"). (Docket No. 8). Count One of the Indictment charges violations of 18 U.S.C. 922(g)(1) and 924(a)(2)

(Prohibited Person in Possession of Firearm: Convicted Felon). Id. Count Two of the Indictment charges a violation of 18 U.S.C. 922(o) (Illegal Possession of a Machine Gun). Id.

The firearm and other contraband were allegedly seized from Defendant's car pursuant to a search warrant issued on November 3, 2017 by a Municipal Judge of the Commonwealth of Puerto Rico, following a showing of probable cause to search Defendant's car. (Docket No. 18-1). The Search Warrant is based on a sworn statement by Police Officer Jonathan Alindato ("Officer Alindato") (Badge #209) of the Bayamón Municipal Police ("BMP") who reportedly chased Defendant to his house after Figueroa-Rivera ran a stop sign. Officer Alindato's sworn statement is not on the record. However, according to the Search Warrant, Officer Alindato's sworn statement supported the following facts:[1]

- That on November 2, 2017, Police Off[icer] Alindato went on duty at 6:00 p.m. at the Municipal Police Station of Bayamon. Once he started his shift, he was assigned preventive patrol in the area of the Falin Torrech Housing Project, Road 167, Road #2, and Street 24 in Sierra Bayamon, along with fellow officer Gilbe1i Lebron, badge #155.

- Subsequently, around 1:28 a.m. approximately, on November 3, 2017 by then, Police Officer Alindato was patrolling on Street 24 in Sierra Bayamón on a duly-marked motorcycle with his patrol lights on, along with Police Off[icer]. Lebron. As they reached the intersection with Street 57, he saw a blue SUV drive

---

[1] Docket No. 18-1 at 1-2.

out of this street (57) at very high speed, ignoring the STOP sign, and pull into Street 24 heading toward us. The vehicle started driving in the middle of both lanes, going against traffic, almost hitting the police officers. They immediately made a U-turn to stop the driver of this vehicle. When they turned on their sirens, the vehicle accelerated, initiating a chase.

- The officers never lost sight of the vehicle, which was at a distance of approximately 20 feet from them. The vehicle turned right onto Street 21 of Sierra Bayamon and parked on that street in front of residence #10, Block 19 of the Subdivision. Police Officer Alindato immediately headed toward the driver of the vehicle, who had already gotten out of the vehicle. He informed him of the reason why he was stopping him and asked him for the usual documents (driver's [license] and vehicle registration). He told him that he didn't have any type of identification and gave him the vehicle registration, which turned out to be a light blue, four (4) door, Toyota, Highlander SUV, license plate number ETW-618, serial number JTEGD21A220039063. When Officer Alindato checked the registration, he noticed that according to the registration, the corresponding registration sticker, number 007924950, had expired in the month of June 2017.

- The officer immediately illuminated the area of the registration sticker and corroborated that the registration sticker of the blue Toyota Highlander had expired. Then he turned on his flashlight to corroborate the SUV's serial number. That is when he noticed that a black magazine stuck out from underneath the driver's seat. He immediately went up to the driver and asked him if he had a permit to carry firearms, and he said no. Therefore, the

officer told him his Miranda rights and placed him under arrest.

- Officer Alindato contacted Sgt. Cabranes, badge #8-081, who instructed him to request the presence of the Canine Unit (K-9). Officer Paul Gandía, badge #29916, and his canine Bank, badge #33099, who is trained to identify controlled substances, [hw: He was the only canine they had] [illegible initials] arrived at the scene. Officer Gandía explained to the driver of the blue Toyota Highlander the procedure to follow and then started conducting the inspection. Bank, the canine, alerted to the presence of controlled substances in the driver's door. Therefore, the officers proceeded to seize the vehicle and transport it to the Bayamón Municipal Police Headquarters with the State Police tow truck, which was driven by Officer Lugo, badge #36004.

- The vehicle remains in the custody of police officers from the various shifts at all times. The detainee was transported in a patrol car to the Bayamón Municipal Police Station. His personal information was taken down and his name turned out to be FERNANDO FIGUEROA RIVERA. The detainee was provided his Miranda rights in writing. He read them; affirmed that he understood them; and signed. Sgt. Cabranes instructed Officer Alindato to go to the District Attorney's Office in Bayamon to request a Search and Seizure Warrant against the vehicle of reference and described above, as we believe there may be firearms inside the vehicle, in addition to the magazine that I observed, and controlled substances.

On April 20, 2018, Figueroa-Rivera filed a *Motion to Suppress* (Docket No. 16). On May 4, 2018, the Government in turn, filed its response in opposition coupled with certified translations of the

Search Warrant and traffic tickets issued to Defendant on November 3, 2017. (Docket No. 18). On July 2, 2018, Figueroa-Rivera submitted a declaration under penalty of perjury in support of his *Motion to Suppress*. (Docket No. 31).

A Magistrate Judge held a hearing on July 27, 2018. She concluded that Defendant had <u>not</u> met the threshold requirements for a <u>Franks</u> hearing and granted Defendant time to determine whether to withdraw or amend his *Motion to Suppress.* (Docket No. 39).[2] Defendant filed the *Amended Motion to Suppress* on November 18, 2018 which the Government opposed on December 7, 2018. (Dockets Nos. 49 and 53). On December 13, 2018, Defendant withdrew his original *Motion to Suppress*. (Docket No. 55).

The *Amended Motion to Suppress* remained pending when the case was transferred to the undersigned on December 12, 2019. (Docket No. 86). At the January 13, 2020 Status Conference, Defendant's counsel requested that a hearing on the motion to suppress be held. (Docket No. 88). The hearing was scheduled as requested but with the caveat that the Court would determine if the hearing was in fact required after reviewing the pending motion. <u>Id.</u>

Succinctly stated, Figueroa-Rivera contends that his Fourth Amendment rights were violated because the BMP: (a) conducted the search and seizure without probable cause; and (b) the requirements

---

[2] This type of hearing is named after <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

of the plain view doctrine were not met as the car was within the curtilage of the house, among other reasons. (Docket No. 49 at 3).

## II.  APPLICABLE STANDARD

There is "no presumptive right to an evidentiary hearing on a motion to suppress." United States v. Cintron, 724 F.3d 32, 36 (1st Cir. 2013) (citation omitted). A hearing must be held only under certain circumstances, such as "if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." Id. (quotation omitted). Most notably, "the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." Id.

A defendant challenging a warrantless search is entitled to a hearing upon "a sufficient threshold showing that no exception to the warrant requirement applied to the search." Cintron, 724 F.3d at 36. Thus, defendants must "allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'" United States v. Agosto-Pacheco, 2019 WL 4566956, at *6 (D.P.R. 2019) (quoting United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996)). Further, a defendant challenging probable cause for a search warrant based on a claim that there were false statements in the affidavit supporting the warrant is entitled to a Franks hearing, upon "a substantial preliminary showing that a false statement (or

omission) was (1) 'knowingly and intentionally, or with reckless disregard for the truth ... included by the affiant in the warrant affidavit,' and (2) 'necessary to the finding of probable cause.'" United States v. Apicelli, 839 F.3d. 75, 81 (1st Cir. 2016) (quoting Franks v. Delaware, 438 U.S. 154, 155–56 (1978)). The First Circuit has held that "[a]ffidavits supporting search warrants are presumptively valid." United States v. Fleury, 842 F.3d 774, 778 (1st Cir. 2016) (quotation marks omitted).

To make these showings, Defendant's allegations "must be accompanied by an offer of proof." Franks, 438 U.S. at 155–171. This means that "[t]hey should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons." Id. These statements may include "[a]ffidavits of sworn or otherwise reliable statements of witnesses […], or their absence satisfactorily explained." Id.; see also, United States v. Moon, 802 F.3d 135, 149 (1st Cir. 2015) (citation omitted) (explaining that conclusory allegations fall "well short of the 'substantial preliminary showing' necessary to justify a Franks hearing." ); United States v. Gomez-Encarnacion, 2015 WL 2354570, at *3 (D.P.R. 2015) (holding that Franks hearing was unwarranted as Defendant failed to submit an offer of proof specifying alleged material omissions in the affidavit attached to a search warrant). Moreover, conclusory and self-serving affidavits which offer no evidence to

contradict the affidavit and merely "set up a swearing contest" are insufficient to meet the preliminary showing requirement. *See* United States v. Perez-Diaz, 2013 WL 12204369, at * 7 (D.P.R. 2013); United States v. Southard, 700 F.3d at 10 (1st Cir. 1983) (Defendants' affidavits which merely denied that they engaged in gambling conversations instead "set up a swearing contest" held insufficient to warrant a Franks hearing); United States v. James, 834 F.Supp. 2d 1, 3 (D.Mass. 2011) ("A defendant's affidavit alone, […] is not cause for an evidentiary hearing if it contains conclusory allegations and makes no offer of proof with respect to any other facts that might support these allegations").

### III. DISCUSSION

**A. Figueroa-Rivera failed to make a sufficient threshold showing to warrant an evidentiary hearing on the Amended Motion to Suppress:**

Figueroa-Rivera's *Amended Motion to Suppress* was unaccompanied by an affidavit or declaration under penalty of perjury. (Docket No. 49). Nevertheless, in reviewing the *Amended Motion to Suppress*, the Court has considered Figueroa-Rivera's July 2, 2018 Unsworn Declaration Under Penalty of Perjury ("Declaration") which he submitted in support of the original *Motion to Suppress*. (Docket No. 31-1). Figueroa-Rivera's Declaration asserts that:

- On November 3, 2017 at approximately 2:00 a.m. he was arrested by the BMP per a warrantless search of his car

at the Sierra Bayamón Development in Bayamón, Puerto
Rico;

- He arrived at his home "without incident" and parked the
  car on the front lawn;

- After two minutes in the car, he stepped out and when he
  was next to his home's front gate to get in, two BMP
  Officers "arrived in motorcycle" and called out to him;

- The BMP Officers arrived without sirens or lights on;

- The Officers then parked on the street next to the
  sidewalk where they talked;

- 10 minutes later, a police officer searched his vehicle
  with a flashlight, allegedly without his consent, and
  made a hand gesture as if it were hand gun;

- He was arrested thereafter; and

- "The statements made by the BMP in support of the search
  warrant issued on November 3, 2017 are not true."

The Declaration fails to make the substantial showing
required for a Franks hearing. (Docket No. 31-1). There are only
two specific factual inconsistencies between Figueroa-Rivera's
Declaration and the Search Warrant's findings of fact. First,
Defendant states that he was in his car for two (2) minutes before
the BMP arrived. Id. ¶ 3. The search warrant on the other hand
found that the BMP Officers trailed Figueroa-Rivera by only twenty
(20) feet and "immediately" headed towards Figueroa-Rivera after
he had parked the car. (Docket No. 18-1 at 1). When they went to
talk to him, he had already gotten out of his car. Id. Second,
Figueroa-Rivera's Declaration asserts that the police arrived with

the lights and sirens turned off while the Search Warrant found that the BMP Officers turned them on while giving chase to Figueroa-Rivera's car. (Docket Nos. 31-1 ¶ 5 and 18-1 at 1). Nevertheless, Defendant's statement about the length of time he spent in the car and the controversy over whether lights or sirens were on when the police arrived at his car are insufficient to cast doubt, much less overcome, the presumptive validity of Officer Alindato's affidavit and the findings of fact in the Search Warrant. Further, Figueroa-Rivera's declaration does not dispute having committed the traffic violations which according to the Search Warrant brought him to the BMP's Officers' attention and resulted in the issuance of five (5) traffic citations.

Figueroa-Rivera's Declaration does not point to specific portions of Officer Alindato's sworn statement that are intentionally false. *See* <u>Franks</u>, 438 U.S. at 155. Instead, the last catchall paragraph of the Declaration states "**[t]hat the statements made by the BMP in support of the search warrant issued on November 3, 2017 are not true.**" Docket No. 31-1 at 2. Thus, Figueroa-Rivera's Declaration seeks to set up a "swearing contest" as decried by the First Circuit. *See* <u>United States v. Staula</u>, 80 F.3d 596, 604 (1st Cir. 1996) (noting that an evidentiary hearing was not required where appellant's affidavit failed to proffer facts which would contradicted a police officer's direct statements). *See also*, <u>Southard</u>, 700 F.3d at 10.

Nor can Defendant attempt to contradict Plaintiff's sworn statement detailing how Defendant drove in the middle of both lanes, went against traffic, and almost hit the Officers (Docket No. 18-1 at 1) by stating that he "arrived home without incident." (Docket No. 31-1 ¶ 2). All told, the Declaration is the type of self-serving conclusory affidavit that Courts have found to be insufficient to warrant a <u>Franks</u> hearing. *See* <u>United States v. Moody</u>, 931 F.3d 366, 374 (4th Cir. 2019); <u>U.S. v. Johnson</u>, 580 F.3d 666, 670-72 (7th Cir. 2009); <u>United States v. Looney</u>, 532 F.3d 392, 394-95 (5th Cir. 2008); <u>Southard</u>, 700 F.2d at 8*;* <u>James</u>, 834 F.Supp. 2d at 4; <u>Perez-Diaz</u>, 2013 WL 12204398, at *7; <u>United States v. Rodriguez-Morales</u>, 2007 WL 3147045, at *4-5 (D.P.R. 2007).

The *Amended Motion to Suppress* also references a neighbor who allegedly observed Figueroa-Rivera arrive home "in normal fashion" and "without being followed." (Docket No. 49 at 2-3). Despite the high bar to obtain a <u>Franks</u> hearing, no declaration under penalty of perjury or affidavit from this purported witness, or an explanation for its absence, were proffered. This, in clear contravention of the Supreme Court's longstanding requirement that an "attack [of the warrant affidavit] **must be more than conclusory and must be supported by more than a mere desire to cross-examine.** […] Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, **or their absence satisfactorily**

**explained.**" *See* United States v. Graf, 784 F.3d 1, 8 (1st Cir. 2015) (quoting Franks, 438 U.S. at 171). The Court highlights the fact that the mere inclusion of affidavits which allege to not corroborate an agent's sworn statement, does not mean that a request for a Franks hearing is automatically granted either. For example, in United States v. Esquilin-Martinez, this district held that "[t]hat the neighbor and handyman [whose signed affidavit Defendant proffered to the Court] did not observe what Agent Castro described does not necessitate the conclusion defendant seeks: that Agent Castro fabricated some or all of his sworn statement." United States v. Esquilin-Martinez, 2018 WL 3816778, at *3 (D.P.R. 2018). In that case, the defendant thus failed to satisfy her burden under the Franks hearing standard.

Taken together, the *Amended Motion to Suppress* (Docket No. 49) and Figueroa-Rivera's Declaration (Docket No. 31-1) fail to make the "substantial showing" necessary for an evidentiary hearing under Franks.

### B. The BMP could lawfully intervene with Figueroa-Rivera in the front lawn of his house in light of the traffic violations they witnessed:

When law enforcement has a reasonable suspicion that a person is engaging in criminal activity, they may make an investigatory stop, commonly referred to as a Terry stop. *See* Terry v. Ohio, 392 U.S. 1 (1968). This "stop" permits law enforcement officials to intervene with a vehicle without a warrant if they have "specific

articulable reasons for believing that a person may be connected to the commission of a particular offense." United States v. Nieves, 256 F. Supp. 3d 133, 136 (D.P.R. 2017) (citation omitted). This "reasonable suspicion" however necessitates more than a "hunch;" rather, it "requires instead that officers 'point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted.'" United States v. Fernandez Ruiz, 2019 WL 7604713, at *1 (D.P.R. 2019) (quoting United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004)).

Generally, traffic violations are considered sufficient reasonable suspicion to justify a Terry stop. For example, in Whren v. United States, the United States Supreme Court explained that "the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment." Whren v. United States, 517 U.S. 806, 819 (1996). The Supreme Court reached the same conclusion in Arizona v. Johnson in 2009. See Arizona v. Johnson, 555 U.S. 323, 327 (2009). In Johnson, the Court determined that "**in a traffic-stop setting, the first Terry condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation.**" Id.

Hence, it is not surprising that, given the right circumstances, other Courts have also sustained that traffic

violations can justify a <u>Terry</u> stop. For example, in <u>United States</u> <u>v. Tiru-Plaza</u>, the First Circuit upheld the district court's determination that a traffic violation (car's occupants were not wearing seatbelts) was appropriate to justify a stop. *See* <u>United States v. Tiru-Plaza</u>, 766 F.3d 111, 119 (1st Cir. 2014). Likewise, in <u>United States v. Velez-Medina</u>, this District determined that a speeding traffic violation, as supported by Agents' testimonies and the traffic tickets, warranted an initial stop. *See* <u>United States v. Velez-Medina</u>, 2018 WL 6167331, at *5 (D.P.R. 2018), report and recommendation adopted, 2018 WL 5778253 (D.P.R. 2018); <u>United States v. Catlett</u>, 2010 WL 1643774, at *6 (E.D. Ky. 2010), report and recommendation adopted, 2010 WL 1643773 (E.D. Ky. 2010) ("[T]he Magistrate Judge concludes that since Officer Terry observed the defendant commit a traffic violation by traveling on his moped the wrong way on a one-way street, it is clear that Officer Terry had a proper basis for the traffic stop."); <u>United States v. Lewis</u>, 2008 WL 5003412, at *3 (S.D. Ohio 2008) ("Officer Ertel observed Lewis drive with his high beam lights on and roll through a stop sign. […] [The traffic citation and MVR recording] shows that Officer Ertel had probable cause to stop Lewis.")

Thus, having witnessed Figueroa-Rivera commit five (5) traffic violations,[3] which the United States submitted in response

---

[3] The traffic citations were for: 1) failure to stop at STOP sign (Ticket No. 108729); 2) Expired Inspection (Ticket No. 108733); 3) Disobeying Official Authority (Ticket No. 108732); 4) Failure to pay annual fees for over 30 days

to Figueroa-Rivera's original *Motion to Suppress*, the BMP could approach Figueroa-Rivera in front of his house to ask him for his driver's license and registration. (Docket No. 18-1). *See also* United States v. Reyes, 283 F.3d 446, 465 (2d. Cir. 2002) (holding that no Fourth Amendment violation occurred when law enforcement was present in an individual's driveway when the officer in question was in pursuit of "legitimate law enforcement business.")

**C. The area in front of the house was not within its curtilage and the requirements of the plain view doctrine were met:**

Figueroa-Rivera avers that the Court must grant the Franks hearing to determine if the area where he parked his car is curtilage and is covered by the protections afforded by the Fourth Amendment. (Docket No. 49 at 4-5). Figueroa-Rivera also contends that the requirements of the plain view doctrine were not met *because* the car was parked in the front lawn of his house. Id. at 3-4. The Court disagrees.

1. The front lawn of the house was not within the curtilage of the house.

The curtilage of the home is one of the places where the Fourth Amendment protects persons from warrantless arrests and searches. *See* United States v. Dunn, 480 U.S. 294, 300 (1987); United States v. Owens, 510 F.3d 57, 64 (1st Cir. 2007). In Dunn, the Supreme Court held that the following factors should be

---

(Ticket No. 108731), and 5) Driving the wrong way (against traffic) (Ticket No. 108730). (Docket No. 18-2 at 1-3).

considered to determine whether an area forms part of a home's curtilage: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." United States v. Hernandez-Mieses, 931 F.3d 134, 146 (1st Cir. 2019) (quoting Dunn, 480 U.S. at 301). However, the Supreme Court notes that these factors are not a "finely tuned formula" that leads to the "correct" answer "when mechanically applied." Dunn, 480 U.S. at 301. Instead, they "are useful only to the degree that […] they bear upon the centrally relevant consideration-whether the area in question is so intimately tied to the home itself that if should be placed under the home's 'umbrella' of Fourth Amendment protection.'" United States v. Bain, 874 F.3d 1, 15 (1st Cir. 2017) (quotation omitted).

     In the case at bar, application of the Dunn factors leads to the conclusion that the front lawn was not within the home's curtilage. None of the Dunn factors favor Defendant. As to the first factor, Figueroa-Rivera provided no evidence as to the proximity of the area where he parked his car to the curtilage of the home. Rather, he simply stated that he parked on the "home's property on my home's front grass." (Docket No. 31-1 at ¶ 2). Even so, "assuming the two were close together, proximity to the

dwelling house is not dispositive." <u>United States v. Brown</u>, 510
F.3d 57, 65 (1st Cir. 2007) (citation omitted). Therefore, "[w]hile
it is true that we have found that privacy expectations are most
heightened when the area in question is nearer (within 20 feet) to
the home, the proximity to the home, standing by itself, does not
*per se*, suffice to establish an area as within the curtilage."
<u>United States v. French</u>, 291 F.3d 945, 952 (7th Cir. 2002). As
Figueroa-Rivera failed to provide evidence as to the proximity of
the area where he parked his car to the home's curtilage, the Court
finds that said element of the <u>Dunn</u> test is not in his favor.

A look at the second and fourth factors reveals that they
also do not favor Defendant. While the area is adjacent to the
home, it is solely used for parking, which addresses the third
<u>Dunn</u> factor, and is unenclosed. (Docket No. 31-1 at 1). Lastly,
there is no indication that Figueroa-Rivera took any steps to
protect the area from observation by passersby. The First Circuit's
opinion in <u>United States v. Brown</u> is enlightening in this regard.
<u>Brown</u> holds that if the relevant part of the driveway "**is freely
exposed to public view, it does not fall within the curtilage**. […]
In order for a part of a driveway to be considered within the
home's curtilage, public viewing of it, must be, at most, very
infrequent". <u>Brown</u>, 510 F.3d at 65; *see also*, <u>Rogers v. Vicuna,
264 F.3d 1, 6 (1st Cir. 2001)</u> ("Rogers admitted […] that his
driveway could be seen from a public way. […] Rogers did not have

a reasonable expectation of privacy in his driveway and that therefore a warrant was not required."); United States v. Ventling, 678 F.2d 63, 64, 66 (8th Cir. 1982) (no reasonable expectation of privacy in residential driveway accessible to and openly visible from public highway). Simply put, Figueroa-Rivera did not make even a preliminary showing that the area where he parked his car was enclosed, not even partially. Thus, he failed to show that deeming to be curtilage the area where he parked his car would protect the "'intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" Dunn, 480 U.S. at 300 (quotation omitted).

   2. The gun magazine was in plain view.

   Under the plain view doctrine, a warrantless seizure is lawful if "(1) the seizing police officer lawfully reached the position from which he could see the item in plain view; (2) the seizure satisfied the probable cause standard; and (3) the seizing officer had a lawful right of access to the object itself." United States v. Allen, 573 F.3d 42, 50 (1st Cir. 2009) (internal quotation marks omitted) (quoting United States v. Antrim, 389 F.3d 276, 283 (1st Cir. 2004)). For Figueroa-Rivera to be able to "demonstrate the existence of a substantial constitutional claim", he "had to proffer specific facts plausibly suggesting" that at least one of the elements of the plain view doctrine was not satisfied. Id. As shown below, Figueroa-Rivera failed to make the requisite showing.

<u>First</u>, Officer Alindato lawfully reached the position from which he could see the gun magazine. *See* <u>United States v. Rivera-Melecio</u>, 2018 WL 6567955, at *8 (D.P.R. 2018), report and recommendation adopted, 2018 WL 6267127 (D.P.R. 2018) ("[T]he police officers did not violate Defendants' Fourth Amendment rights in conducting the <u>Terry</u> stop of the Ford Edge because [of] the [traffic violations] […]. **Thus, the seizing officers lawfully reached the position from which they could see the illegal item at plain view.**") As explained in the previous section of this Opinion and Order, the area where the car was parked was <u>not</u> within the home's curtilage.[4] Thus, the Officers' intervention with Figueroa-Rivera was justified considering the latter's purported traffic violations. Officer Alindato could lawfully look at the windshield to examine the car's registration sticker and confirm whether the registration had expired as stated in the car registration document Figueroa-Rivera provided to the Officers. *See* <u>United States v. Bynum</u>, 508 F.3d 1134, 1137 (8th Cir. 2007) ("Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle.") As the Officers had a lawful right to be in the position wherein they

---

[4] Per the Search Warrant, Figueroa-Rivera parked his car on the street in front of his house. (Docket No. 18-1 at 1). This also coincides with the fact pattern in <u>Rivera-Melecio</u>, wherein the District Court of Puerto Rico concluded that a proper search and seizure occurred as the vehicle was on a public street. *See* <u>Rivera-Melecio</u>, 2018 WL 6567955, at *8.

could see the seized item in plain view, the first element of the plain view doctrine is satisfied.

Second, the discovery of the gun magazine amounts to probable cause to arrest Defendant. As explained by the First Circuit, "[i]n general terms, probable cause exists when police have sufficient reason to belief that they have come across evidence of a crime." United States v. Paneto, 661 F.3d 709 (1st Cir. 2011) (citing Texas v. Brown, 460 U.S. 730, 742 (1983)); United States v. Curzi, 867 F.3d 36, 45 (1st Cir. 1989)). Moreover, "[i]n the 'plain view' context, this means that probable cause exists when the incriminating character of the object is immediately apparent to the police." United States v. Sanchez, 612 F.3d 1, 5 (1st Cir. 2010). However, the First Circuit has cautioned that "[t]he officer need not be certain of the incriminating character of an object, but, rather, must have a belief based on a 'practical nontechnical probability' that the object is evidence of a crime." Paneto, 661 F.3d at 714 (quotation omitted). Figueroa-Rivera's *Amended Motion to Suppress* does not dispute the incriminating character of the gun magazine. In his Declaration he does not dispute the Government's version of events related to the search of the vehicle. The affidavit does not contradict the officer's direct statement that he was able to see the magazine underneath the driver's seat of the Toyota Highlander when he was leaning over the area where the car's registration sticker was located and

shining his flashlight into the car. Instead, the Declaration only states that some alleged ten (10) minutes after the Officers parked on the street "a police officer searches my vehicle at the scene with a flashlight without my consent, and makes a gesture with his hand as if it were a handgun. [And] [that] BMP arrested me [Defendant] thereafter." (Docket No. 31-1 ¶¶ 7-8). These vague statements however fail to mention how Officer Alindato searched his vehicle and are insufficient to call into question the latter's affidavit and the validating of the search warrant.

"For a search and seizure of objects in plain view, the incriminating nature of the evidence must be immediately apparent. This means probable cause." James Cissell, Federal Criminal Trials §2-6[e] (Matthew Bender 2020 ed.). The District Court of Puerto Rico's opinion in United States v. Rivera-Melecio is instructive regarding as to when seeing a firearm amounts to the probable cause prong of the plain view doctrine. In Rivera-Melecio, after stopping the vehicle for a traffic violation, the police officer saw a firearm in plain view inside a vehicle beneath the right front passenger seat and which he knew was not legal. Rivera-Melecio, 2018 WL 6567955, at *7. The Court determined therein that "[t]hese observations of the agents, prior to actually placing both Defendants under arrest, provided them with probable cause to believe a crime had taken place in their presence justifying the arrest for possession of illegal firearms." Id. at *8. Further,

the First Circuit has noted that Puerto Rico law "creates a
presumption that the possession or act of carrying a firearm
without the appropriate weapons license or permit to carry 'shall
be deemed as prima facie evidence of the fact that said person
possesse[d] [or carried] the weapon with the intention of
committing a crime.'" United States v. Aviles-Vega, 783 F3d 69, 73
n. 3 (1st Cir. 2015) (quoting P.R. Laws Ann. tit. 25, § 458j).
Therefore, the Officers in the case at bar also had probable cause
to arrest Defendant in this regard.

Similarly, in United States v. Nuñez, the Court determined
that the arrest of the defendant was lawful and with probable cause
after observing, while verifying the car's registration sticker,
at plain view in defendant's waist a nickel-plated magazine with
a black handle of a gun. *See* United States v. Nuñez, 601 F. Supp.2d
388, 400 (D.P.R. 2008). In Nuñez, the Officer requested that the
defendant get out of the car and asked for a firearm license. Id.
The defendant, as in the case at bar, indicated that he did not
have a firearm license and the police officer arrested him. Id.
The Court notes that Figueroa-Rivera failed to contradict in his
*Amended Motion to Suppress* his lack of a firearm license at the
time of his arrest. (Docket No. 49 at 2). The report and
recommendation adopted by the Nuñez Court stated:

> [T]he decision to place defendant Núñez under arrest […]
> was objectively reasonable because, **under the
> circumstances, the officers had probable cause inasmuch**

> **defendant was in possession on a fully automatic loaded weapon without a license which was found at plain view […]. Thus, under these circumstances, there was probable cause for defendant Núñez' warrantless arrest and for the seizure of the weapon […] and no basis for the suppression of the evidence.**

Nuñez, 610 F. Supp. 2d at 400. Considering that the present case contains an almost identical factual scenario as the Nuñez case, this Court concludes that there was probable cause for the seizure of the magazine which was found at plain view and for the subsequent arrest of Figueroa-Rivera. *See also*, United States v. Jimenez, 864 F.2d 686, 690 (10th Cir. 1988) (holding that probable cause existed that a shotgun in plain view was contraband even if police officer at first failed to see all of the shotgun because he saw enough to conclude the barrel had been cut off.) Thus, the second element of the plain view doctrine is also satisfied.

Third, although he sought a search warrant, Officer Alindato could have lawfully seized the magazine upon seeing it through the windshield. Here, as in Rivera-Melecio and Nuñez, the seizing officer had a "lawful right" to access the object itself after stopping the car for a traffic violation and having probable cause that Figueroa-Rivera had contraband, i.e. the firearm, and did not have a permit for it. *See* Rivera-Melecio, 2018 WL 6567955, at *9; Nuñez, 601 F. Supp. 2d at 400; Velez-Medina, 2018 WL 6167331, at *6 ("Agent Camacho properly seized the gun from Vélez-Medina's automobile. The agents were legally in a position to observe the

seized evidence […]. They also had a lawful right to access the gun because they were entitled to conduct a protective sweep.")

The Officers in the case at bar were able to lawfully seize the magazine. *See e.g.*, New York v. Class, 471 U.S. 1003 (1986) (holding as a proper search the actions of a police officer who saw a gun when he reached into the passenger compartment of a vehicle while searching for a VIN number after driver had been previously stopped for a traffic violation and the driver had already exited the car). Thus, the final element of the plain view doctrine was satisfied as well.

### CONCLUSION

For the reasons set forth herein, Defendant's *Amended Motion to Suppress* (Docket No. 49) is **DENIED.** The February 21, 2020 suppression hearing is hereby converted into a Status Conference.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 18th day of February 2020.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge